IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PETER ROGERS, and MICHELLE                    3:10-CV-844-PK
ROGERS,

                    Plaintiffs /                    FINDINGS AND
                    Counterclaim-Defendants,         RECOMMENDATION

v.

SAXON MORTGAGE SERVICES, INC.,

                    Defendant / Counterclaimant /
                    Crossclaimant /
                    Crossclaim-Defendant,

and STATE FARM FIRE AND
CASUALTY COMPANY,

                    Defendant / Crossclaimant /
                    Crossclaim-Defendant.

———————————————————

PAPAK, Magistrate Judge:

On or about July 19, 2005, plaintiffs Peter and Michelle Rogers ("plaintiffs") executed a Deed of Trust for real property located at 5681 SW Prosperity Park Road, Tualatin, Oregon, 97062 ("the Property"). Defendant Saxon Mortgage Services, Inc. ("Saxon") was the servicer of the obligation secured by the Deed of Trust. Defendant State Farm Fire and Casualty Company ("State Farm") issued a homeowners insurance policy on the home, on which Saxon was named as a mortgagee. The Property was damaged by a fire on or about December 16, 2008. Around the same time that the Property was damaged, plaintiffs stopped making their mortgage payments. Before the insurance claim related to the fire settled, Saxon foreclosed on the home. The parties now dispute who is entitled to the insurance proceeds from the fire claim and the amount of the proceeds. To that end, they have filed various claims, counterclaims, and crossclaims against each other. They all seek an order from the court declaring their entitlement to the insurance proceeds.

Presently before the court are the parties' summary judgment motions (## 47, 54, 58), which ask the court to decide, as a matter of law, who is entitled to the insurance proceeds. Also pending is Saxon's request for judicial notice (#57). For the reasons discussed below, Saxon's request for judicial notice should be granted in part and denied in part and the court take judicial notice only of Exhibits A-C. With regard to the summary judgment motions, State Farm's motion should be denied in its entirety, Saxon's motion should be granted and an order entered declaring it entitled to declaratory relief in the amount of $223,131.35, and plaintiffs' motion should be granted in part and denied in part, and an order entered entitling them to any excess insurance proceeds in an amount to be determined at trial. Finally, plaintiffs' motion should be granted as to Saxon's counterclaims and on State Farm's affirmative defense of failure to comply, and

denied as to their claim for reasonable attorney fees.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

/ / /

/ / /

/ / /

# BACKGROUND[1]

This case is essentially an insurance coverage dispute for fire damage to a home.  On July 19, 2005, plaintiffs purchased the Property for use as their residence.  (P. Rogers Decl. (#50) at ¶ 2; M. Rogers Decl. (#52) at ¶ 2.)  The purchase was accomplished when plaintiffs made and delivered an Adjustable Rate Note in the principal amount of $890,000, secured by a Deed of Trust against the Property.  (Request for Judicial Notice (#57), Ex. A (Deed of Trust).[2])  New Century was the original beneficiary under the Deed of Trust, but Saxon was the attorney in fact for the Trust and the servicer of the mortgage.  (Saxon Amended Answer (#22) at ¶ 21; Third Am. Compl. (#17) at ¶ 3.)  The Property was pledged as sole collateral for the mortgage and Saxon had no other interest in the Property.  (Third Am. Compl. at ¶ 5.)

---

[1]  The following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.  That is, in construing the record I view the evidence and all factual inferences drawn from the underlying facts in the light most favorable to the non-moving party, for purposes of the motion now before the court only.  *See, e.g., T.W. Elec. Serv., Inc.,* 809 F.2d at 630-31 ("[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party:  if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  . . .  Inferences must also be drawn in the light most favorable to the nonmoving party.  Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts, . . . and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party.") (citations omitted).

[2]  The court notes that plaintiffs make limited objections to Saxon's request for judicial notice (#57), which includes the Deed of Trust (Ex. A), the Trustee's Deed (Ex. B), the Special Warranty Deed (Ex. C), and the State Farm Insurance Policy (Ex. D).  Plaintiffs object only to the insurance policy, Exhibit D, on the grounds that it is incomplete, but make no objections to the trust documents (exhibits A-C) which appear to have been properly recorded with the Clackamas County Recorder's office.  Consequently, the request for judicial notice should be granted in part and denied in part and the court take judicial notice only of Exhibits A-C.  The court notes that the parties have included other complete copies of the insurance policy, so the court will cite to those copies where necessary.

The Deed of Trust states that "in the event of a loss, the Borrower shall give prompt

notice to the insurance carrier and Lender." (Request for Judicial Notice, Ex A at p. 6.)

Moreover, unless the parties agreed otherwise, the Deed of Trust requires the following in the

event of a loss:

> [A]ny insurance proceeds, whether or not the underlying insurance was
> required by Lender, shall be applied to restoration or repair of the
> Property, if the restoration or repair is economically feasible and the
> Lender's security is not lessened. During such repair and restoration
> period, Lender shall have the right to hold such insurance proceeds until
> Lender has had an opportunity to inspect such Property to ensure the work
> has been completed to Lender's satisfaction, provided that such inspection
> shall be undertaken promptly.
>
>         \*\*\*
>
> If the restoration or repair is not economically feasible or Lender's security
> would be lessened, the insurance proceeds shall be applied to the sums
> secured by this Security Instrument, whether or not then due, with the
> excess, if any, paid to the Borrower.

(*Id.* at pp. 6-7.)

Plaintiffs obtained home and personal property insurance from State Farm, Policy No. 37-

EU-0921-6 ("the Policy"). (Third Am. Compl. at ¶ 5; P. Rogers Decl. at ¶ 3; M. Rogers Decl. at

¶ 3; Bragg Decl. (#48), Ex. 5; Walker Decl. (#51), Ex. 1.[3]) Saxon was named as a mortgagee on

the Policy. (Bragg Decl., Ex. 5 at p. 29.) The Policy's "Conditions" section provides in relevant

part:

> 1. **Insurable Interest and Limit of Liability**. Even if more than one
> person has an insurable interest in the property covered, we shall not be
> liable:
> > a. to the insured for an amount greater than the insured's interest;

---

[3] Plaintiffs submitted a copy of the Policy as Exhibit 5 to the Bragg Declaration, and
State Farm submitted a copy of the Policy as Exhibit 1 to the Walker Declaration. Both copies
appear to be complete, but plaintiffs' version also includes the declarations page and several
pages of additional endorsements. Thus, the court will cite to the copy attached to the Bragg
Declaration.

Page 5 - FINDINGS AND RECOMMENDATION

or
    b.  for more than the applicable limit of liability.
***
10.  **Mortgage Clause**.  The word "mortgagee" includes trustee.
    a.  If a mortgagee is named in this policy, any loss payable under
Coverage A shall be paid to the mortgagee and you, as interests
appear.  If more than one mortgagee is named, the order of payment
shall be the same as the order of precedence of the mortgages.
***

(*Id.* at pp. 14-15.)

The Policy's "Losses Insured" Section provides as follows:

**COVERAGE A - DWELLING**
We insure for accidental direct physical loss to the property described in
Coverage A, except as provided in SECTION 1 - LOSSES NOT
INSURED.

**COVERAGE B - PERSONAL PROPERTY**
We insure for accidental direct physical loss to the property described in
Coverage B caused by the following perils . . .
    1.  Fire or lightening
***

(*Id.* at p. 8.)

The applicable "Loss Settlement" provision for dwelling damage provides in relevant

part:

**COVERAGE A - DWELLING**
**1. A1 - Replacement Cost Loss Settlement - Similar Construction**
    a.  We will pay the cost to repair or replace with similar
construction and for the same use on the premises . . . the damaged
part of the property covered. . . subject to the following:

        (1)  until actual repair or replacement is completed, we will
pay only the actual cash value at the time of the loss of the
damaged part of the property, up to the applicable limit of
liability . . . not to exceed the cost to repair or replace the
damaged part of the property;

        (2) when the repair or replacement  is actually completed,
we will pay the covered additional amount you actually and

> necessarily spend to replace the damaged part . . . or an
> amount up to the applicable limit of liability . . . whichever
> is less.

(*Id*. at p. 12.)

On or about December 16, 2008, when the mortgage was in place and the Policy in force, the Property was the subject of a house fire. (Third Am. Compl. at ¶ 6.) On or about December 24, 2008, plaintiffs notified State Farm of the loss. (Bragg Decl., Ex. 8; Pomerleau Decl. (#65), Ex. 101.) State Farm noted that the Policy provided coverage for "the building loss (Coverage A), personal property loss (Coverage B), and additional living expense (Coverage C)," and that the Policy limits on the date of the loss were as follows:

>  Coverage A:   $1,036,019.00
>  Coverage B:   $777,014.00
>  Coverage C:   Amount incurred limited to a maximum 24 months from the date of loss.
>  Deductible:   $500

(*Id*. at p. 1.)

State Farm deemed the fire a covered loss. (Third Am. Compl. at ¶ 6.) Around this same time, plaintiffs stopped making payments to Saxon. (Furr Depo.[4] at p. 13; P. Rogers Depo. at 93.)

On or about March 13, 2009, State Farm made payment on the claim, issuing a check in the amount of $246,444.09, made payable to "FRED MILLARD & PETER J. ROGERS & SAXON MORTGAGE SERVICES INC., ITS SUCCESSORS AND/OR ASSIGNS." (Third Am. Compl. at ¶ 7; Bragg Decl., Ex. 4.) The check was sent to Fred Millard's office, who was

---

[4] Both parties have submitted documents with various attachments, including multiple excerpts of depositions, attached to different documents. Unless otherwise indicated, all of the citations are directly to the authenticating depositions, not to the documents to which they are attached.

Page 7 - FINDINGS AND RECOMMENDATION

plaintiffs' attorney at the time.  (P. Rogers Depo. at p. 96.)  State Farm did not otherwise provide

Saxon notice of the issuance of the check.  (Elkanich Decl. (#56), Ex. A at pp. 2-3.)  Subsequent

to the filing of this action State Farm requested the return of the check and voided it.  (Third Am.

Compl. at ¶ 7; Pomerleau Depo. at p. 80.)

On or about March 25, 2009, Saxon was informed of the damage by a contractor who

performed emergency repairs on the home.  (Furr Depo. at pp. 18-21.)  Saxon maintains that this

was the first time it was notified that the home had sustained some fire damage.  (*Id*. at p. 21.)

The contractor was seeking Saxon's endorsement of a check for approximately $2,700.00  (*Id*. at

pp. 19-21.)  Even though plaintiffs' account was delinquent, because the amount of the check

was small, Saxon endorsed it and sent it back to the contractor.  (*Id*.)  The following day, Saxon

sent a letter to plaintiffs informing them that because of the delinquent status of the loan, Saxon

would be monitoring the repairs to the Property.  (*Id*. at pp. 21-22; Bragg Decl., Ex. 2.)

Beginning in late March 2009, Saxon sent CoreLogic Field Services to the Property to

perform visual inspections of the Property.  (Furr Depo. at p. 52; Bragg Decl., Ex. 6.)  The Core

Logic inspectors visited the home once a month for seven months.  (Bragg Decl., Ex. 6).  Those

inspections were limited to exterior observations, including photographs of the home, and each

time the inspectors noted that the Property condition was "good," and there was "no" damage.

(*Id*.)  The inspections on March 21, April 23, and May 29, 2009, were categorized as "occupancy

determination."  (*Id*. at pp. 1-6.)  The inspections on June 25, July 25, August, 24, and

September 22, 2009 were categorized as "foreclosure inspection."  (*Id*. at pp. 7-14.)

On May 20, 2009, Saxon approved foreclosure of plaintiffs' home.  (Bragg Decl, Ex. 1 at

p. 2.)  On May 29, 2009, Peter Rogers contacted Saxon about the fire and let them know that the

house was not livable. (*Id.* at pp. 2, 4-5; Furr Depo. at pp. 37-28.) Peter Rogers recalls that at that time, he told Saxon that he was in possession of a check from State Farm. (P. Rogers Decl. at ¶ 9.) He recalls that he also gave the amount of the check. (*Id.*) Saxon contends that while Rogers did tell Saxon about the fire and the amount of the loss, he did not mention that he had received a check from State Farm. (Furr Depo. at pp. 71, 76-77.) It is Saxon's position that had it known about the check for $246,444.09, it would have demanded that it be provided so it could monitor the repairs to the Property as permitted by the Deed of Trust. (*Id.* at p. 57.)

On May 29, 2009, Saxon sent two letters to Peter Rogers, confirming that Rogers had contacted them about the loss, and noting that Saxon had "not received the insurance settlement/loss draft check issued by your insurance company," and instructing that "when received, please mail the check to SAXON[.]" (Elkanich Decl., Ex. B at p. 1.) The correspondence included information about the procedures to follow to make the home repairs, noting that if the loss "should exceed the outstanding debt on your loan . . . SAXON may use the funds to pay the loan in full or to apply to the outstanding debt." (*Id.* at p. 2.) Saxon sent similar correspondence again one month later. (Furr Depo. at pp. 57, 91-92.)

Saxon proceeded with the foreclosure process and the Property was sold by non-judicial trustee's sale on October 1, 2009. (Request for Judicial Notice, Ex. B (Trustee's Deed).) At the time of the sale, the total amount that plaintiffs owed Saxon was $903,131.35. (Elkanich Decl., Ex. D; Bragg Decl., Ex. 9.) This amount reflects $852,589.03 in principal, $47,780.50 in interest, and $2,761.82 in late charges and other fees. (*Id.*) The Property was purchased for $680,000 by the investor HBC Bank USA, National Association, as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2006-NC1. (*Id.*; Request for Judicial Notice, Ex. B (Trustee's Deed).)

Page 9 - FINDINGS AND RECOMMENDATION

On or about February 2, 2010, the Property was sold for $535,000.  (Request for Judicial Notice, Ex. C (Special Warranty Deed).)

On April 13, 2010, plaintiffs filed suit in Multnomah County Circuit Court as Case No. 1004-05384.  The action was removed to this court on July 19, 2010.  Plaintiffs bring a single claim against State Farm for breach of contract on the grounds that the Policy entitles them to additional payments for the loss of the dwelling, living expenses, and for damaged/destroyed personal property.[5]  (Third Am. Compl. at ¶ 21.)  As relief, plaintiffs seek an order directing State Farm to reissue a check for the payment of the insurance proceeds, an order declaring that Saxon has no interest in the proceeds, and a judgment against State Farm for damages, reasonable costs, disbursements, attorney fees, and pre and post judgment interest.  (Third Am. Compl. at pp. 5-6.)  Plaintiffs allege that the dwelling damage is $481,908.48, and that said amount is due under the insurance policy.  (Id. at ¶ 22a.)

Saxon responded by alleging various affirmative defenses on plaintiffs' claim for declaratory relief and bringing its own crossclaim for declaratory relief against State Farm. (Saxon Amended Answer at ¶¶ 17-29, 66-75.)  Saxon also brought counterclaims against plaintiffs for declaratory relief, estoppel, conversion, breach of fiduciary duty, and trespass to chattels, which relate to plaintiffs' handling of the insurance proceeds check issued in March 2009.  (Id. at ¶¶ 30-66.)  As relief, Saxon requests that the court dismiss all claims against it with prejudice and that plaintiffs and State Farm be liable to Saxon for the full amount of Saxon's claim, which it asserts is the value of the mortgage as of the date of the fire, minus the amount for

---

[5] At oral argument, plaintiffs and State Farm confirmed that they have resolved the dispute over personal property coverage and living expenses, so the only remaining dispute is payment for the value of the damage to the dwelling.

which it was able to sell the Property. (*Id*. at ¶ 73 and p. 14.)

State Farm responded by alleging two affirmative defenses: (1) that plaintiffs failed to comply with all the conditions of the Policy, and (2) plaintiffs had no equity in the Property at the time of the loss and thus are not entitled to Policy benefits for damage to the dwelling. (State Farm Amended Answer (#23) at ¶¶ 16-17.) State Farm also brings a crossclaim against Saxon for declaratory relief on the grounds that completion of the non-judicial foreclosure extinguished all of Saxon's interest in the Property, including any entitlement to insurance benefits under the Policy. (*Id*. at ¶¶ 26-35.) As relief, State Farm requests that all claims against it be dismissed with prejudice and judgment entered in its favor on Saxon's crossclaim for declaratory relief.

## ANALYSIS

This case focuses on a dispute over which of the parties has the right to recover benefits under the Policy for the fire damage, and the amount of those benefits. Each of the parties seek summary judgment in their favor in the form of a declaratory judgment that it is the sole recipient of the insurance proceeds and dismissing all other claims to the contrary. Plaintiffs also seek summary judgment in their favor on one of State Farm's affirmative defenses, on their request for attorney fees from State Farm, and on Saxon's crossclaims and affirmative defenses. The court will first address the issue of who, if anyone, is entitled to payment under the Policy before addressing the remaining claims.

## I. Declaratory Judgment

It is State Farm's position that because Saxon foreclosed on the Property before the insurance claim could be settled, plaintiffs' ownership interest and Saxon's insurable interest in the home were eliminated, so neither is entitled to any insurance proceeds for the fire damage. It

is Saxon's position that as the only named mortgagee on the Policy, its interest survives as a

matter of law since the Property was damaged prior to the foreclosure and the foreclosure did not

fully extinguish plaintiffs' outstanding debt, entitling it to insurance proceeds in an amount at

least equal to the outstanding debt. Plaintiffs contend that even though they have no current

interest in the home, because the fire damage occurred prior to the foreclosure and before the

claim was resolved, they are entitled to recover the value of their interest at the time of the fire,

and that Oregon's anti-deficiency statute prevents Saxon from recovering any portion of the

insurance proceeds. The court will first address what the parties' rights were at the time of the fire

before turning to whether, and to what extent, foreclosure affected those rights.

### A. Right to Proceeds at Time of Fire

In order to enforce the terms of an insurance policy under Oregon law, the insured must

have "an insurable interest in the things insured . . . at the time of the loss." ORS § 742.011. "It

is well-settled that anyone has an insurable interest in property who derives a benefit from its

existence or would suffer loss from its destruction." *Avrit v. Forest Industries Ins. Exhc.*, 72 Or.

App. 571, 575, 696 P.2d 583, 586 (1985) (quoting *Bird v. Central Mfg. Ins. Co.*, 168 Or. 1, 6, 120

P.2d 753, 755 (1942)). The "primary rationale underlying the insurable interest requirement is to

prevent wagering policies in which the insured's only interest in the property insured is in its loss

or destruction." *Id.* (citing *Fenter v. Gen. Acc. Fire and Life Assur. Corp.*, 258 Or. 545, 484 P.2d

310 (1971)). The parties do not dispute that at the time of the fire damage, plaintiffs and Saxon

had insurable interests in the Property. Nor do they dispute that at the time of the fire, State Farm

deemed it a covered loss and made payment on the claim in the amount of $246,444.09. What the

parties dispute is whether plaintiffs' right to recover was fixed at the date of the loss, the amount

thereby recoverable, and the extent to which the mortgage clause and subsequent foreclosure impacted the parties' ability to recover.

### 1. Plaintiffs' Right to Recover

It is State Farm's position that regardless of what plaintiffs' insurable interests were at the time of the fire, because their ownership interests were extinguished by the subsequent foreclosure, they have not suffered an "actual loss" that entitles them to any recovery under the Policy.  The parties disagree as to what constitutes an "actual loss" by reference to the analysis in three Oregon cases. *Avrit*, 72 Or. App. 571, 696 P.2d 583, *Fenter*, 258 Or. 545, 484 P.2d 310; *Transp. Equip. Rentals, Inc. v. Oregon Auto. Ins. Co.*, 257 Or. 288, 478 F.2d 620 (1970).  The courts in both *Avrit* and *Fenter* examined whether there was an "actual loss" to the insured by considering whether the insured had an insurable interest "at the time of the fire." *Avrit*, 72 Or. App. at 576, 696 P.2d at 587; *Fenter*, 258 Or. at 552, 484 P.2d at 314.  In *Fenter*, the Oregon Supreme Court determined that the insured had an insurable interest even where, at the time of the fire, the property had been foreclosed for non-payment of taxes, the statutory redemption period had expired, and the property had been deeded to the county. 258 Or. at 552, 484 P.2d at 314.  In *Avrit*, the Oregon Court of Appeals concluded that purchasers of a home destroyed by fire before the closing date and before purchasers took possession had sufficiently stated the existence of an insurable interest at the time of the fire in order to support a claim for breach of contract. 72 Or. App. at 573, 576, 696 P.2d at 585, 587.  In *Transp. Equip. Rentals, Inc.*, the plaintiff was not the named insured, but rather owned a log loader and leased it for seven days to a logging company. 257 Or. at 290-91, 478 P.2d at 621-22.  The plaintiff was named as a loss payee on the insurance policy which further named the logging company as the insured. *Id*.  The loader was destroyed,

Page 13 - FINDINGS AND RECOMMENDATION

and plaintiff sought to collect for its loss. *Id.* The court determined that the plaintiff, "claiming as loss payee, must show the right of the named insured to collect," and since there was no actual loss to the insured because they were merely borrowing the loader when it was destroyed, there was "no obligation to pay the insurance to its appointee." 257 Or. at 298, 478 P.2d at 625.

It is clear that under Oregon law, the inquiry into whether plaintiffs suffered an actual loss, and thus, the amount that the insured can recover, is determined at the time of the loss. If the insured does not suffer an actual loss, then even if the loss-payee has suffered an actual loss, it is not compensable. Here, it is undisputed that at the time of the fire, plaintiffs were the named insured and they were actually living in the home. The extensive smoke damage caused by the fire made the home uninhabitable. Thus, plaintiffs suffered an actual loss at the time of the fire. The court is not persuaded by the cases cited from other jurisdictions that purport to support State Farm's argument that the relevant value of the interest in the Property is measured at some time other than at the time of the loss. That being said, just because the amount that plaintiffs *can* recover is measured at the time of the fire, not some later date, that does not end the inquiry into whether subsequent events influenced the actual amount of plaintiffs' compensable losses.

### 2. Amount Recoverable

It is State Farm's position that plaintiffs' insurable interest, and thus, the amount they may recover, is limited to their equity at the time of their loss. According to State Farm, plaintiffs' insurable interest at the time of the fire was $96,868.65 because the fair market value of the home was $1 million and plaintiffs' outstanding debt was $903,131.35.

In support, State Farm cites to cases from other jurisdictions that have limited the amount of recovery to the amount of equity at the time of the damage. *O'Neal v. Commercial Assurance*

Page 14 - FINDINGS AND RECOMMENDATION

*Co.*, 263 So.2d 246, 247 (Fla. App. 1972) (vendee's insurable interest limited to the amount paid under the oral contract); *Whiting v. Auto Owners Ins. Co.*, 1991 WL 105749, at *1 (6th Cir. 1991) (insured's interest in mortgaged property is limited to the amount of equity in the property at the time of the fire).  The only Oregon case offered in support is *Fenter*, where the court allowed the former owner who still had a statutory right of redemption at the time of the loss to "prove what he stood to lose, and what loss he actually suffered, as a result of the fire." 258 Or. at 553, 484 P.2d at 314.  While State Farm has presented evidence that other jurisdictions limit the amount of recovery to the amount of equity in the property at the time of the loss, the court is not persuaded that Oregon law is so limited.

Instead, the court will consider the language of the Policy itself, which does not limit the amount recoverable to the amount of equity.   State Farm is obligated to "pay the cost to repair or replace . . . the damaged part of the property[.]" (Bragg Decl., Ex. 5 at pp.12, 29.)  However, "until actual repair or replacement is completed, [State Farm] will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability . . . not to exceed the cost to repair or replace the damaged part of the property." (*Id*. at p. 12.) Plaintiffs acknowledge that no repairs were completed.  (Pls' Memo in Supp. Of Summ J. (#58) at p. 16.)  Thus, according to the Policy, plaintiffs' insurable interest at the time of the loss was the actual cash value of the damaged Property.  As of the date of the loss, the Policy limit for dwelling damage was $1,036,019.00.  (Bragg Decl., Ex. 8; Pomerleau Decl., Ex. 101.)

The parties dispute the damaged Property's actual cash value.  State Farm's initial check was for $246,444.09, which is State Farm's estimate of the structural damage.  (Allen Decl. (#68),

Ex. 201.)[6] Plaintiffs have presented evidence from a professional estimator that the actual cash

value of the dwelling at the time of the fire was $481,908.47. (Priest Decl. (#49), ¶ 5, Ex. 1, at p.

58.) Consequently, a material issue of fact exists regarding the actual cash value of the damaged

Property and summary judgment on this issue is not appropriate.

### 3. Application of Mortgage Clause

Finally, State Farm contends that because the mortgage debt ($903,131.35) outweighed

plaintiffs' alleged damages ($481,908.47), Saxon, as named mortgagee, had priority at the time of

the loss and was entitled to collect under the terms of the Policy's mortgage clause, so plaintiffs

are not entitled to the insurance proceeds. Plaintiffs assert that regardless of whether the funds

would have gone to Saxon or plaintiffs on the date of the loss, State Farm is still contractually

obligated to pay the actual cash value at the time of the loss for the plaintiffs' benefit. Plaintiffs

further assert that Saxon lost its entitlement to its share of the proceeds when it foreclosed on the

home, and thus, plaintiffs are the only remaining beneficiary.

The mortgage clause provides that "[i]f a mortgagee is named in this policy, any loss

payable under Coverage A shall be paid to the mortgagee and to you, as interests appear." (Bragg

Decl., Ex. 5 at p. 15.) In *Haskin v. Greene*, 205 Or. 140, 147-48, 286 P.2d 128, 132 (1955), the

Oregon Supreme Court noted that the general rule where an insurance policy contains such an

---

[6] The court notes that plaintiffs challenge the admissibility of this report on the grounds
that the State Farm claims representative who prepared the report is not qualified to render such
an opinion. However, I find that the issue of the actual cash value of the damage to the Property
is a disputed issue of material fact and that challenges to expert testimony on the issue can be
addressed at a *Daubert* hearing prior to trial.

Page 16 - FINDINGS AND RECOMMENDATION

open mortgage clause[7] is that a mortgagee possesses "a superior right to the proceeds of the policy to the extent of the mortgage debt," so long as the mortgage is in full force at the time of the loss. In such a situation, the mortgagee may "apply the insurance money in full, or *pro tanto*, satisfaction of the debt, and such payment amounts to satisfaction of the mortgage to the extent of the payment or the mortgagee may hold the insurance money to discharge the debt as it becomes due if the debt is not due at the time of loss and payment." *In re Encinas*, 27 B.R. 79, 81 (Bankr. Or. 1983) (citing *Haskin*, 205 Or. at 147-48, 286 P.2d at 132).

Here, at the time of the loss, plaintiffs' debt exceeded the amount of plaintiffs' alleged damages, so Saxon indeed had a superior right to the insurance proceeds as a matter of law. Whether Saxon's right to the insurance proceeds was subsequently impacted by the foreclosure and the partial extinguishment of plaintiffs' debt is discussed next.

### 4. Conclusion

In sum, at the time of the fire, plaintiffs had an insurable interest and suffered an actual loss, and thus, were entitled to recover under the terms of the Policy. They were entitled to recover the actual cash value of the damaged Property, though an issue of material fact exists as to the calculation of that amount. However, Saxon, as named mortgagee, had a superior right to the proceeds to the extent of the mortgage debt. The normal procedure would have been for Saxon to hold the insurance proceeds and manage the repairs while plaintiffs continued to make their

---

[7] The parties do not specifically address the issue of whether the mortgage loss-payable clause is a "simple" or "open" loss-payable clause, where the mortgagee's rights are dependent upon those of the insured, or if it is a "standard" mortgage clause, which creates an independent contract between the insurer and the loss payee. *See* 2 INSURANCE (OREGON CLE 1996) § 20.70 (2003 supplement); *Haskin*, 205 Or. at 147-151, 286 P.2d at 132-33 (discussing the difference between open and standard mortgage clauses). The court construes the mortgage clause at issue here as an open mortgage clause.

mortgage payments.  Since this is not what happened, the court must consider the impact of the subsequent foreclosure on the parties' respective interests, keeping in mind that Saxon has a superior right to any proceeds.

### B.  Right to Proceeds After Foreclosure

It is Saxon's position that it is entitled to the insurance proceeds to satisfy its loss since it sold the Property for less the full amount of plaintiffs' outstanding debt.  Plaintiffs and State Farm contend that Oregon's anti-deficiency statute, O.R.S. § 86.770, precludes Saxon from recovering any proceeds that it may have been due under the terms of the Policy at the time of the loss.  They also contend that Saxon's insurable interest was fully extinguished by foreclosure.

#### 1.  Application of Anti-Deficiency Statute

Oregon's anti-deficiency statute, O.R.S. § 86.770, provides in relevant part:

> (2) Except in accordance with subsection (4) of this section, after a trustee's sale under ORS 86.705 to 86.795, or after a judicial foreclosure of a residential trust deed, an action for a deficiency may not be brought or a judgment entered against the grantor, the grantor's successor in interest or another person obligated on:
>
>> (a) The note, bond or other obligation secured by the trust deed for the property that was subject to the trustee's sale or the judicial foreclosure [.]
>>
>> ***
>
> (4) This section does not preclude:
>
>> ***
>>
>> (b) An action against a guarantor for a deficiency that remains after a judicial foreclosure.

The parties appear to agree that the plain language of O.R.S. § 86.770(2) precludes Saxon from seeking a deficiency judgment directly from the plaintiffs.  What the parties dispute is whether the statute also operates to preclude Saxon from receiving any of the proceeds from

plaintiffs' insurance claim.  Plaintiffs and State Farm contend that the broad language which

prohibits a deficiency judgment "against the grantor, the grantor's successor in interest *or another*

*person*," clearly prohibits Saxon from seeking the insurance proceeds from State Farm because

the proceeds are a form of plaintiffs' assets and allowing Saxon access to them would be the same

as a deficiency judgment.  O.R.S. § 86.770(2) (emphasis added).  Saxon reads the statute much

more narrowly, and contends that it only prohibits it from seeking a deficiency judgment against

plaintiffs directly, but does not in any way impact its ability to pursue its right, as named

mortgagee on the Policy, to recover the insurance proceeds from State Farm.

      Saxon contends that in enacting the anti-deficiency statute, the legislature intended only to

ban creditors from pursuing an additional action against the homeowner once it had already

collected on the debt by way of foreclosure, but did not intend to impact the creditor from

collecting any remaining balance from other sources, such as insurance proceeds.  In support, it

relies primarily upon language in *Sumner v. Enercon Develop. Comp.*, 307 Or. 579, 584, 771 P.2d

619, 621 (1989), in which the Oregon Supreme Court noted that the statute was intended only to

"bar a deficiency judgment . . . [i]t does not extinguish the debt; it merely closes the avenue for

collecting it."  Plaintiffs and State Farm contend that *Sumner* is not applicable to the issue

presented here, since it concerns another statute entirely, O.R.S. § 88.070, which addresses

purchase money mortgages, not residential trust deeds, which is at issue here.  However, despite

their differences, both statutes bar creditors from seeking deficiencies from homeowners after

foreclosure.  *See In re Daraee*, 279 B.R. 853, 857 (Bankr. Or. 2002) (discussing the similarities

between the statutes).  Both statutes require a holder of a security interest to elect a remedy,

thereby foreclosing further remedies. *Family Bank of Commerce v. Nelson*, 72 Or. App. 739, 742-43, 697 P. 2d 216, 218 (1985) (noting that the election of remedies portion of O.R.S. § 88.070 is similar to the one in O.R.S. § 86.770(2)).  And both statutes are designed to limit a mortgagee's remedies in order to prevent double recovery.

Moreover, the legislative history to the most recent amendment to the statute is clear that the statute is "intended to preclude suits against a homeowner following foreclosure for any deficiency *remaining on additional notes secured by the property*." *Davis v. Flagstar Bank, FSB*, No. 3:11-CV-317-PK, 2011 WL 3471509, at * 2-4 (D. Or. Aug. 8, 2011) (discussing legislative history and amendment of O.R.S. § 86.770) (emphasis added).  Saxon's pursuit of the insurance proceeds is not in any way an attempt to bring a deficiency suit against plaintiffs for additional notes on the Property.  Thus, it appears as though the most recent amendments to the statute were designed to protect against a totally different type of situation than at issue here.  The legislature, in broadening the statute did not intend to also protect third parties, such as insurance companies, or to otherwise affect insurance proceeds.

There is no binding authority to support the argument advanced by plaintiffs and State Farm that Saxon's pursuit of the insurance proceeds amounts to a deficiency judgment against plaintiffs.  The cases set forth by them involve other states' anti-deficiency statutes or deficiency actions against mortgagors that did not otherwise concern actions against insurers for insurance proceeds.  In pursuing its rights under the Policy, Saxon is not seeking a deficiency judgment against plaintiffs in some roundabout way.  Consequently, the anti-deficiency statute does not prevent Saxon from pursuing the insurance proceeds so long as it is otherwise entitled to them.

Page 20 - FINDINGS AND RECOMMENDATION

### 2. Effect of Foreclosure

As discussed above, it is clear that Saxon, as the named mortgagee, had priority over plaintiffs to any insurance proceeds at the time of the fire. *Haskin*, 205 Or. at 148, 286 P.2d at 132.  In fact, State Farm apparently recognized this interest, as it sent a check for the structural damage in the amount of $246,444.09 payable to plaintiffs and to Saxon.  (Bragg Decl., Ex. 4.) At the time, State Farm had no way of knowing whose interest took priority, but it understood, at the time that it paid the proceeds under the claim, that Saxon, as the named mortgagee, had some entitlement to them, and wrote the check accordingly.  State Farm now contends that the subsequent foreclosure amounted to a full and complete satisfaction of Saxon's interest and also extinguished any entitlement it may have had to the proceeds at the time of the loss.

It is State Farm's position that under Oregon law, a non-judicial trustee's sale completely discharges the debtor's liability to the lender, regardless of whether the amount actually bid at the sale fully discharges the outstanding debt.  According to State Farm, this discharge also applies to any insurance policies on the Property, thereby extinguishing Saxon's insurable interest.  Saxon agrees that the non-judicial foreclosure indeed fully satisfied plaintiffs' debt to it even though the bid amount was less than their total outstanding debt, and that, as discussed above, the anti-deficiency statute prevents it from seeking further recovery directly from plaintiffs.  However, the foreclosure did not extinguish Saxon's right to the insurance proceeds because this avenue is foreclosed only where the entire outstanding debt is satisfied.  But in situations, such as the one here, where the amount recovered at the sale is less than the outstanding debt, the mortgagee's insurable interest in the property is not destroyed and it may recover insurance proceeds equal to

Page 21 - FINDINGS AND RECOMMENDATION

the outstanding amount owed.

The court agrees with Saxon. Though there are no Oregon cases directly on issue, the Oregon Supreme Court has provided at least an "initial framework" in *Haskin*. *MBank, Inc. v. State Farm Fire and Casualty Co.*, No. 3:10-CV-1276-AC, 2011 WL 6182421, at *4 (D. Or. Dec. 13, 2011) (citing *Haskin*, 205 Or 140, 286 P.2d 128). In *Haskin*, the Oregon Supreme Court noted that the general rule under an open mortgage loss-payable clause is that when a mortgagee has purchased the property at a foreclosure sale, the mortgagee is "no longer entitled to the benefits of an insurance policy taken out by the mortgagor." 205 Or. at 149, 286 P.2d at 132. This is because "the mortgagee has an interest in the policy only as security for his debt, and that, as a result of the foreclosure proceedings and the purchase of the mortgaged premises *for the full amount of the debt* and judgment, the debt is fully extinguished and the purchaser ceased to be a creditor or mortgagee." *Id.* (emphasis added). Because a "mortgagee's insurable interest under an insurance policy is limited to the amount of the debt," it follows that "[o]nce the debt has been fully extinguished by [a] full credit bid, so has the insurable interest." *MBank*, 2011 WL 6182421, at *5 (D. Or. Dec. 13, 2011) (citing cases).

The Ninth Circuit has "clarified that the loss-payees may recover on an insurance policy after the deed of trust is extinguished at a trustee's sale as long as a portion of the debt remains." *Univers. Mortg. Co., Inc. v Prudential Ins. Co.*, 799 F.2d 458, 460-61 (9th Cir. 1986) (citing *Rosenbaum v. Funcannon*, 308 F.2d 680, 684 (9th Cir. 1992)) (both applying California law). Thus, "[a] full or partial extinguishment of a mortgage debt, whether prior or subsequent to the loss, precludes, *to the extent thereof*, any recovery on a loss by the loss payable mortgagee." *Id.*,

799 F.2d at 460 (emphasis added).  This is because "[t]he rights of a loss-payable mortgagee are determined as of the time of the loss.  Therefore, an extinguishment of the mortgage or deed of trust by foreclosure after the loss does not affect the liability of the insurance company to a loss-payable mortgagee." *Rosenbaum*, 308 F.2d at 684.  "[E]xtinguishment of a mortgage or deed or trust by sale of the property at foreclosure does not necessarily extinguish the debt itself.  Only to the extent that the mortgagee receives payment upon the debt through the foreclosure is the debt itself extinguished." *Id.*  "[A]lthough a mortgagee purchasing at foreclosure subsequent to a loss . . . may still claim a right to recovery under the policy, such a claim is obviously limited to such balance, if any, as remains on the debt." *Id.*  "[I]n no event is the mortgagee due to collect more than the debt secured." *Fed. Home Loan Mortg. Corp. v. Transamerica Ins. Co.*, 89 Hawaii 157, 163, 969 P.2d 1275, 1281 (1998).

At least one court in this district has concluded that "Oregon courts would follow the clear majority of state and federal courts to find *full satisfaction* of the mortgage debt, either by way of a foreclosure sale or an estoppel deed in lieu of foreclosure, extinguishes any right of [the holder of a secured interest] to demand further compensation related to the value of [the Property], and bars recovery under the policy." *MBank*, 2011 WL 6182421, at *5.  In *MBank*, the only issue for the court was whether MBank, as the holder of a secured interest in the property, was entitled to recover under an insurance policy issued to the property owner for water damage, where the damage occurred after the property owner defaulted on the loan, but before the lender and homeowner entered into a settlement agreement. *Id.*, at *1-4.  Significant to the court's decision was that the agreement conveyed the property by estoppel deed to MBank and "expressly stated that transfer of the Deed would extinguish [the property owner's] obligation for the loan," and

also expressly waived MBank's "right to collect any deficiencies for the debt." *Id.*, at *5. The court concluded that the deed and agreement "were in lieu of foreclosure and the transfer constituted a complete satisfaction of [the property owner's] debt owed to MBank on the loan." *Id.* In concluding that the deed "constituted a total satisfaction of the mortgage debt and eliminated MBank's insurable interest," the court noted that "it is well settled that full or partial extinguishment of the debt itself, whether prior to the loss . . . or subsequent to the loss . . . precludes to the extent thereof, any recovery by the loss-payable mortgagee for the plain and sole reason that the debt, itself, has been to that extent extinguished." *Id.*, at *6 (quoting *Rosenabum*, 308 F.2d at 684) (internal citation and quotation omitted).

Given the above framework, the court thinks it reasonable to conclude that in Oregon, entry of a full-credit bid or otherwise full satisfaction of the outstanding debt would also fully extinguish Saxon's interest in the Property. However, where a portion of the debt remains after the foreclosure sale, then Saxon, as loss-payable mortgagee, still has an insurable interest that may be recovered under the terms of the Policy. Saxon's insurable interest has been reduced to the extent that plaintiffs outstanding debt has been satisfied, but it has not been fully extinguished. Here, the Property was purchased at the trustee's sale on October 1, 2009, for $680,000, and ultimately sold for $535,000. At the time of the sale, plaintiffs owed Saxon $903,131.35. Regardless of how you measure Saxon's loss, the foreclosure sale did not bring in the full amount of the outstanding debt. Consequently, Saxon may recover the balance under the Policy.

In so concluding, the court has carefully considered the cases cited by State Farm, but notes that each of those cases dealt with situations where the secured debt was fully satisfied. *See Mbank*, 2011 WL 6182421, at * 5-6 (agreement conveying estoppel deed "constituted a total

satisfaction of the mortgage debt and eliminated [the holder of security interest's] insurable interest," thereby barring the right to further recovery under insurance policy); *Whitestone Savings and Loan Ass'n v. Allstate Ins. Co.*, 28 N.Y.2d 332, 334-35 (N.Y. 1971) (mortgagee's insurable interest was terminated when the outstanding debt was satisfied by foreclosure where the mortgagee bid the full amount of its outstanding loan at the sale); *Rosenbaum*, 308 F.2d at 684 (when damage occurred prior to a full bid at a trustee's sale, recovery from the insurance company was precluded on the grounds that the debt was fully satisfied by a full credit bid). Here, in contrast to these "full credit bid" cases, Saxon received a less than full bid at the trustee's sale, and thus, its interest survives foreclosure and it may recover the insurance proceeds, up to the amount necessary to extinguish plaintiffs' outstanding debt at the time of the sale.

### 3. Amount of Recovery

#### a. Saxon

Saxon contends that it is entitled to recover, as insurance proceeds, an amount at least equal to the amount of the outstanding debt at the time of the foreclosure sale. Since plaintiffs owed $903,131.35 at the time of the foreclosure and the offset bid was $680,000.00, Saxon seeks at least $223,131.35 in order to satisfy the outstanding debt.

In addition, Saxon claims that because it was unaware of the damage to the home at the time of the bid, it is entitled to additional compensation above and beyond the amount of plaintiffs' outstanding debt. Saxon claims that it made a higher bid than it would have if it had known about the damage, so it should be compensated for the difference between the amount of the bid ($680,000) and the reduced amount it sold the Property for ($535,000). In support, Saxon cites several cases from other jurisdictions that allow additional recovery when a bid fails to

Page 25 - FINDINGS AND RECOMMENDATION

account for unknown damage to the property. *See Fed. Home Loan Mortg.*, 89 Hawaii at 163-64,

969 P.2d at 1281-82; *Tech Land Development, Inc. v. South Carolina Ins. Co.*, 57 N.C. App. 566,

569-70, 291 S.E.2d 821, 823-24 (1982); *City of Chicago v. Maynur*, 28 Ill. App.3d 751, 755, 329

N.E.2d 312, 315 (1975).  However, as Saxon itself points out, most courts that allow such

additional recovery do so because the property is damaged after foreclosure, which is not the case

here.  Moreover, many courts have rejected similar requests on the grounds that a mortgagee's

mistake as to the value of the property is not compensable. *See Universal Mort. Co.*, 799 F.2d at

459-60 (9th Cir. 1986) (denying mortgagee's request to reform the trust deed to reflect a lower

sale price where it subsequently learned that the property had been stripped of its fixtures and

appliances); *Fireman's Fund Mortg. Corp. v. Allstate Ins. Co.*, 838 P.2d 790, 796-97 (Alaska

1992) (concluding that mortgagee was only entitled to recover insurance proceeds sufficient to

satisfy its outstanding debt).

　　Here, the parties dispute the date upon which Saxon had knowledge of the fire damage and

whether it was ever made aware of the existence of the $246,444.09 check from State Farm.

However, despite this factual dispute, examination of the record reveals that while Saxon may not

have learned the extent of the damage until many months after the damage occurred, it was aware

that the Property was damaged long before the foreclosure sale was finalized in October 2009.

There is evidence that it was informed of at least some damage in late March 2009, when it

endorsed a check reimbursing a contractor for repair work.  (Furr Depo. at pp. 18-21.)  Moreover,

plaintiffs informed Saxon that they were no longer living in the house because of the fire on May

29, 2009.  (*Id*. at pp. 71, 76-77.)  Consequently, Saxon is not entitled to additional recovery and

may only recover the amount of the outstanding debt at the time of the foreclosure sale.  This

Page 26 - FINDINGS AND RECOMMENDATION

amount is $223,131.35.

### b. Excess Proceeds

Subtracting the amount that Saxon is entitled ($223,131.35) from State Farm's original estimate of the extent of the structural damage ($246,444.09) would leave $23,312.74 of excess proceeds. If the factfinder ultimately concludes that the actual cash value that State Farm is required to pay is higher than the amount of the original check, then the excess proceeds will be significantly greater. It is clear that Saxon would not be entitled to the excess.

It is State Farm's position that regardless of whether plaintiffs suffered a loss at the time of the fire, the subsequent events reduced their "actual loss" to nothing since their debt to Saxon was fully satisfied by the foreclosure. Since Saxon agrees that its interest is limited to satisfaction of the outstanding debt, State Farm claims that it is entitled to the excess.

The court disagrees. The general rule is that "[w]hen insured property is damaged prior to foreclosure, courts allow the . . . mortgagee to retain under the mortgage clause those proceeds amounting to any deficiency after foreclosure. The mortgagor recovers the remainder of the proceeds." *Tech Land Develop.*, 57 N.C. App. at 569, 291 S.E. 2d at 823. In *Montgomery v. First Nat. Bank*, the Oregon Supreme Court made clear that the parties' interests are fixed at the time of the loss, and thus, an insurer cannot claim the benefit of subsequent events, such as the repair of the damaged property or a collateral agreement in order to reduce its obligation. 265 Or. 55, 70, 508 P.2d 428, 435 (1973). The court explicitly rejected the argument that a "foreclosure settlement . . . put plaintiffs in as good a position as they were prior to the fire," on the grounds that the "interest was jeopardized by the fire and as of the date of the fire, [the insurance company] became obligated to compensate . . . according to the terms of its agreement. The

insurer's obligation was not cancelled by subsequent collateral agreements . . . which mitigated [the] damages from the fire." 265 Or. At 71, 70 508 P.2d at 435.  Here, State Farm was not relieved of its obligation to compensate plaintiffs for their actual loss on the basis that their interests were subsequently modified.  Thus, plaintiffs are entitled to the excess proceeds, in an amount to be determined at trial.

### C. Conclusion

At the time of the fire, plaintiffs had an insurable interest and suffered an actual loss, entitling them to recover the actual cash value of the damaged Property, though an issue of material fact exists as to what this amount is.  Saxon had a superior right to the proceeds as a matter of law, and so plaintiffs would only have been entitled to any leftover, excess proceeds.

The anti-deficiency statute does not bar Saxon from receiving the insurance proceeds even though it foreclosed on the home.  Since plaintiffs' debt was not fully satisfied by the foreclosure sale, Saxon may recover from State Farm an amount equal to the outstanding debt at the time of the sale.  In order to satisfy the outstanding debt, Saxon is entitled to $223,131.35.  Any excess proceeds would go to plaintiffs.  However, because there is a disputed issue of material fact as to what the actual cash value is that State Farm is required to pay under the terms of the Policy, summary judgment may not be granted to plaintiffs on the amount of the damages.  Consequently, Saxon's motion for summary judgment should be granted and an order entered entitling it to declaratory relief in the amount of $223,131.35.   Plaintiffs' motion for summary judgment should be granted in part and an order entered entitling it to any excess proceeds, that amount to be determined by a factfinder.  State Farm's motion for summary judgment should be denied as to their claims for declaratory relief.

## II. Remaining Claims

Having resolved the parties' claims for declaratory relief, all that remains is plaintiffs'
motion for summary judgment on the following: (1) Saxon's counterclaims and affirmative
defenses; (2) plaintiffs' claim for attorney fees against State Farm;  and (3) State Farm's
affirmative defense of failure to comply.  Saxon agreed at oral argument that should the court find
that it is entitled to declaratory relief, then there are no remaining damages on its tort claims
against plaintiffs.  Because damages are a necessary element of Saxon's tort claim, and since there
are no damages in light of Saxon's recovery of insurance proceeds, plaintiffs should be granted
summary judgment on Saxon's counterclaims.  This leaves only plaintiffs' motion for summary
judgment on their request for attorney fees from State Farm and on one of State Farm's
affirmative defenses.

### A. Attorney Fees

Plaintiffs's Third Amended Complaint seeks damages from State Farm for breach of
contract for the dwelling damage, personal property loss, and additional living expenses.  In
addition to declaratory relief, plaintiffs seek an award of reasonable attorney fees pursuant to
O.R.S. § 742.061, which provides for them "if settlement is not made within six months from the
date proof of loss is filed with an insurer and an action is brought in any court of this state upon
any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of
any tender made by defendant in such action."  On March 23, 2011, State Farm made payments to
plaintiffs for their personal property and additional living expenses claims.  (Bragg Decl., Ex. 17.)
According to plaintiffs, because State Farm failed to pay the claims within six months after
plaintiffs filed their proof of loss, they are entitled to summary judgment on their claim for

attorney fees.

O.R.S. § 742.061 requires that an insurance company settle a claim within six months from the date that "proof of loss is filed with an insurer." Here, the fire occurred on or about December 16, 2008, and State Farm settled the personal property and additional living expenses claims on March 23, 2011, which is well over six months after the damage. The critical inquiry is whether plaintiffs provided "proof of loss" six months before final settlement of the claims.

When it comes to proof of loss, Oregon requires only that the insured provide enough information so that the insurer is able to "estimate its obligations." *Dockins v. State Farm Ins. Co.*, 329 Or. 20, 29, 985 P.2d 796, 801 (1999). Oregon courts have excused deviations from the strict requirements regarding the form of the proof of loss so long as the proof submitted "accomplishes the purpose of proof of loss," which is "to afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an intelligent estimate of its rights and liabilities before it is obligated to pay." *Id.*, 329 Or. at 28; 985 P.2d at 29 (quoting *Sutton v. Fire Ins. Exch.*, 265 Or. 322, 325, 509 P.2d 418, 419 (1973), quoting 14 Couch, Cyclopedia of Insurance Law § 49:373, p. 15 (2d ed)). A submission may be deemed sufficient even if it does not allow the insurer to "estimate its obligations," so long as "the insurer could accomplish that purpose through a reasonable investigation." *Hall v. Speer*, 244 Or. App. 392, 396-97, 261 P.3d 1259, 1261 (2011). "If a proof of loss is unclear an insurer has a duty of inquiry." *Id.*

Here, plaintiffs provided notice of the loss to State Farm on or about December 24, 2008. (Third Amended Compl. at ¶ 20; State Farm's Amended Answer (#23) at ¶ 13; Pomerleau Decl., Ex. 101.) According to State Farm, once it was notified of the loss, it repeatedly asked plaintiffs

to submit information regarding the nature and extent of their damaged property and additional living expenses, but plaintiffs delayed providing this information, thereby delaying proof of loss for purposes of O.R.S. § 742.061. The information was finally provided in full on February 4, 2011, and the claims paid shortly thereafter, on March 23, 2011. Plaintiffs claim that they cooperated with the investigation by allowing State Farm to access and inventory some of the personal property on October 21, 2009, and thus, as of that date, State Farm was able to complete its investigation and determine the amount owed to plaintiffs for the property damage.

### 1. Personal Property Claim

The record indicates that beginning on December 24, 2008, State Farm repeatedly communicated with plaintiffs about the documentation it needed to process their personal property claims. (Pomerleau Decl., Exs. 101-110, 112, 113, 114.) Though State Farm did help inventory some items inside the home in October 2009, the personal property loss inventory was not completed on this date. (Gross Decl. (#77) at ¶¶ 3-5.) Plaintiffs submitted their first set of personal property inventory forms on February 23, 2010, noting that additional items would be submitted in the future. (Plummer Decl. (#66) at p. 1; M. Rogers Decl. at ¶ 7; Parks Decl. (#67), Ex. 5.) On April 12, 2010, State Farm paid plaintiffs $65,457.31, based on this initial inventory. (Pomerleau Decl., Ex. 116; Plummer Decl. at p. 2.) Plaintiffs filed suit on April 13, 2010, and the parties engaged in discovery related to the personal property inventories. (Parks Decl. at pp. 1-2.) Plaintiffs then submitted their additional property inventory on November 15, 2010, and a revised version on February 4, 2011. (M. Rogers Decl. at ¶ 7; Parks Decl. at p. 2.) State Farm paid the amount of the revised claim on March 23, 2011. (Parks Decl. at p. 2, Ex. 6.)

Based on the record as a whole, is clear that State Farm promptly paid plaintiffs for their

Page 31 - FINDINGS AND RECOMMENDATION

personal property losses once they had received the inventory forms which were necessary for them to estimate their obligations. Even though it had been aware of the fire and some of the losses to the property, there is no way it would have been able to estimate its obligations without having information from plaintiffs about what items were lost or damaged. State Farm could not gather the information about plaintiffs' losses from any other source other than plaintiffs themselves, and thus, they satisfied their duty of inquiry by regularly communicating with plaintiffs regarding the information that was still needed to process their claims.

For purposes of proof of loss, the relevant dates are the dates that plaintiffs submitted their personal property inventories. Plaintiffs submitted their first inventory on February 23, 2010, and were paid on April 12, 2010, well within the six months allowed. At the time they submitted this form, plaintiffs indicated that they would submit further itemization for additional items, which they did on November 15, 2010. They were paid for these additional items on March 23, 2011, which was also well within the six months allowed by O.R.S. § 742.061. Consequently, plaintiffs' claim for attorney fees for their personal property claims should be denied.

## 2. Additional Living Expenses Claim

Payment for the additional living expenses was also made piecemeal. Shortly after the fire, plaintiffs began living in another home they owned. On February 10, 2009, State Farm sent a check for the first two months of rental expenses, and agreed to pay $4,500 per month for temporary housing. (M. Rogers Decl. at ¶ 8, Ex. 1; Pomerleau Decl., Exs. 103, 105, 106.) The copy of the letter accompanying the check makes clear that State Farm still needed information from plaintiffs regarding their monthly furniture rental expenses. (Pomerleau Decl., Ex. 103.) On April 27, 2009, State Farm made payment for plaintiffs' May 2009 living expenses but did not

make any further payments until March 23, 2011. (Bragg Decl., Ex. 7.)  On May 12, 2009, State

Farm sent plaintiffs a letter confirming that on May 4, 2009, plaintiffs agreed to provide State

Farm with information about their furniture rental and utility expenses within two weeks.

(Pomerleau Decl., Ex. 107.)  At this time, State Farm made clear that "until [State Farm]

recieve[s] this documentation, [it] will be unable to issue any further payment under this

coverage." (*Id*.)  State Farm sent several letters inquiring about the status of this information

between May and September 2009 (*Id*., Exs. 107, 108, 109, 110), but it did not receive this

itemization until January 14, 2011, during Peter Rogers' deposition (P. Rogers Depo. at pp. 124-

25).  The remaining portion of the additional living expenses claim was paid in full on March 23,

2011, two months after State Farm received all documentation necessary to process the claim.

(Bragg Decl., Ex. 7.)

      Here, State Farm made every attempt to obtain the information it needed from plaintiffs in

order to process their additional living expenses claim.  As early as January 14, 2009, State Farm

informed plaintiffs that it needed the furniture rental and utility expenses information (Pomerleau

Decl., Exs. 102), and made mention of this information in each subsequent letter it sent to

plaintiffs (*Id*., Exs. 105-110).  In May 2009, State Farm explicitly stated that it would not continue

to pay plaintiffs' additional living expenses until it had received the additional information that it

deemed necessary to the claim, yet plaintiffs waited until January 2011 to fully comply.  Despite

these repeated, clear communications, plaintiff continued to delay providing the company the

information it needed to make full payment on the claim.  Moreover, State Farm satisfied its duty

of inquiry during processing of the claim, making crystal clear that it would not pay any portion of

the additional living expenses claim until it had all the information it needed.  Once plaintiffs

finally provided this information State Farm promptly made full payment.  To allow plaintiffs to

recover attorney fees on account of their own failure to follow State Farm's specific, repeated

instructions would thwart the purpose of proof of loss, which is, at its heart, to afford the insurer

the opportunity to investigate and make an intelligent estimate of its obligations.  *Dockins.*, 329

Or. at 28; 985 P.2d at 29.  Consequently, State Farm did not have proof of loss regarding

plaintiffs' additional living expenses claim until January 14, 2011.  Because State Farm made

payment on March 23, 2011, well within the six months allowed by O.R.S. § 742.061,  plaintiffs'

claim for attorney fees for their additional living expenses claim should be denied.

### B.  State Farm's First Affirmative Defense

State Farm's first affirmative defense is that plaintiffs failed to comply with all the Policy

conditions when they failed to submit personal property inventories and receipts in support of

their additional living expenses claims.  Plaintiffs seek summary judgment on this claim on the

grounds that it has been rendered moot since the parties have settled these claims as discussed

above.  State Farm disagrees.

As discussed above, plaintiffs ultimately provided State Farm the information it needed to

process its claims for personal property and additional living expenses.  Despite repeated requests

by State Farm, it still took plaintiffs many months to provide the documentation required to fully

process these claims.  The parties dispute whether plaintiffs complied with the provisions of the

Policy requiring them to submit the particular forms provided by State Farm for inventory of

personal property and additional living expenses.  However, it is well settled that so long as the

proof submitted "accomplishes the purpose of proof of loss," by giving the insurer "adequate

opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an

intelligent estimate of its rights and liabilities before it is obligated to pay," it will be deemed

sufficient. *Dockins*, 329 Or. at 28, 985 P.2d at 29 (quoting *Sutton*, 265 Or. at 325, 509 P.2d at

419).  For example, the proof of loss provision in *Sutton* required the insured to submit a "proof of

loss, signed and sworn by the insured, stating to the knowledge and belief of the insured as to [the

particulars of the loss]," and included at least ten different categories of information that the

insured was required to submit to the insurer.  265 Or. at 324 n.1, 509 P.2d at 419 n.1.  The court

concluded that the insured had substantially complied with the proof of loss provision because the

proof submitted included all of the particulars enumerated in the policy, but was missing only the

insured's sworn signature. *Id.*, 265 Or. at 325-26, 509 P.2d at 420.

 Here, it is undisputed that plaintiffs eventually submitted all the information required by

the Policy and the personal property and additional living expense claims were fully resolved.

Plaintiffs did take their time in completing all the requirements, but in the end, they substantially

complied.  Consequently, plaintiffs should be granted summary judgment on State Farm's

affirmative defense of failure to comply.

### RECOMMENDATION

 For the reasons set forth above, Saxon's Request for Judicial Notice (#57) should be

GRANTED IN PART and DENIED IN PART and the court take judicial notice of Exhibits A-C

only.

 State Farm's Motion for Summary Judgment (#47) should be DENIED.

 Saxon's Motion for Partial Summary Judgment (#54) should be GRANTED and an order

entered declaring it to declaratory relief in the amount of $223,131.35.

 Plaintiffs' (Corrected) Motion for Summary Judgment (#58) should be GRANTED IN

PART and DENIED IN PART.  Plaintiffs should be GRANTED summary judgment on all

Saxon's counterclaims and on State Farms's affirmative defense of failure to comply.  Plaintiffs'

Motion should be DENIED as to their claim for reasonable attorney fees related to their personal

property and additional living expenses claim.  Finally, Plaintiffs' Motion should be GRANTED

in PART and DENIED IN PART on their claim for declaratory relief, and an order entered

entitling them to any excess insurance proceeds in an amount to be determined at trial.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation.  If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within fourteen (14) days after being served

with a copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED this 24th day of April, 2012

Paul Papak
United States Magistrate Judge